Filed 5/22/15  In re J.O. CA2/5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| In re J.O., a Person Coming Under the Juvenile Court Law. | B258854 (Los Angeles County Super. Ct. No. 92772) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>        Plaintiff and Respondent,<br><br>    v.<br><br>B.R.,<br><br>        Defendant and Appellant. | ORDER MODIFYING OPINION [NO CHANGE IN JUDGMENT] |

The opinion filed May 11, 2015, is modified on page 22 to delete "I" beneath the

signature line for Presiding Justice Paul Turner and insert the following, "We."

Further, beneath the signature line on page 22 for Associate Justice Richard M. Mosk, the following is to be inserted:

GOODMAN, J.\*

_____    _____    _____

TURNER, P.J.             MOSK, J.                  GOODMAN, J.\*

---

\*    Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| In re J.O., a Person Coming Under the Juvenile Court Law. | B258854 (Los Angeles County Super. Ct. No. CK92772) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, <br><br> Plaintiff and Respondent, <br><br> v. <br><br> B.R., <br><br> Defendant and Appellant. | |

APPEAL from orders of the Superior Court of Los Angeles County, Philip L. Soto, Judge.  Affirmed.

Suzanne Davidson, under appointment by the Court of Appeal, for Defendant and Appellant.

Mark J. Saladino, County Counsel, Dawn R. Harrison, Assistant County Counsel, and Kimberly Roura, Deputy County Counsel, for Plaintiff and Respondent.

# I. INTRODUCTION

The mother, B.R., appeals from the juvenile court's orders denying her Welfare and Institutions Code[1] section 388 petition and terminating her parental rights. She also challenges the order terminating her reunification services at the 18-month review hearing. We affirm the findings and orders under review.

# II. PROCEDURAL HISTORY

On March 28, 2012, the Los Angeles County Department of Children and Family Services (the department) filed a section 300 petition on behalf of the child J.O., 13 months old, and a half-brother, Daniel T. The petition alleges the mother had a history of illicit drug abuse and was a current methamphetamine and marijuana user. The mother was allegedly under the influence of illicit drugs while caring for the child. The petition further alleges the mother's home was filthy and unsanitary. The child was detained at the March 28, 2012 detention hearing. The mother was granted monitored visits three times a week for three hours each visit.

At the April 30, 2013 jurisdiction and disposition hearing, the mother pled no contest to an amended petition. The juvenile court sustained count b-1 of the amended petition: "The . . . mother . . . has an unresolved history of illicit drug use and is a current user of methamphetamine and marijuana, which periodically impairs mother's ability to provide regular care for the children. In March 2012 and on prior occasions, the mother was under the influence of illicit drugs while the child [J.O.] was in the mother's care and supervision. The mother's use of illicit drugs places the children at risk of harm." The juvenile court released Daniel to the custody of D.T. Daniel is the son of D.T. The juvenile court terminated jurisdiction over Daniel. The child was declared a dependent of the juvenile court pursuant to section 300, subdivision (b). The mother was ordered to

---

[1]     All further statutory references are to the Welfare and Institutions Code unless stated otherwise.

participate in a full narcotics program, random weekly drug testing, and individual counseling to address case issues. The mother was granted monitored visits three times a week for three hours each visit.

On July 2, 2012, the juvenile court limited the mother's educational rights over the child in favor of the foster parents, F.L. and J.R. At the six-month review hearing on October 29, 2012, the juvenile court found the mother was in partial compliance with the case plan. The department was given discretion to liberalize the mother's visitation including overnight visits. At the 12-month review hearing on May 29, 2013, the mother was granted additional reunification services. The juvenile court found the mother was in partial compliance with the case plan. The department was given discretion to liberalize her visits, including walking on the matter for placement of the child with the mother in her residential program.

At the 18-month review hearing on October 29, 2013, the juvenile court found the mother was in partial compliance with the case plan. The juvenile court found return of the child to the mother would create a substantial risk of detriment to the youngster's physical and emotional well-being. The juvenile court terminated family reunification services for the mother and set a section 366.26 hearing date. The mother was served with a notice of intent form to file an extraordinary writ petition. But the juvenile court did not orally advise the mother of the need to file a writ petition to preserve her right to appeal these orders. The section 366.26 hearing was continued several times so the department could provide the father with the hearing notice.

On April 23, 2014, the mother filed a section 388 petition. The mother requested placement of the child with her at the residential program, or in the alternative, six months of reunification services with liberalized visits. The juvenile court granted the mother a hearing on her section 388 petition.

At the August 26, 2014 hearing, the juvenile court denied the mother's section 388 petition. The juvenile court found it was not in the child's interest to return him to the mother's custody because of his bond with his foster family. The juvenile court further found the mother was still in a residential treatment program and might relapse in the

3

event her drug issues remained unresolved.  In addition, the  juvenile court found the child was adoptable and the beneficial parent-child relationship exception to adoption did not apply.  The juvenile court then terminated the mother and father's parental rights.

## III.  EVIDENCE

### A.  Detention Report

The March 28, 2012 detention report stated the mother admitted to smoking marijuana and using methamphetamine for the past six years.  She admitted using methamphetamine recently while the child was sleeping.  The mother resided with the child and her family in an abandoned house.  Her older son, Daniel, lived with D.T.  The mother stated the house had no running water or gas.  Children's social worker Sevana Naaman observed the house had a strong odor of smoke and chemicals.  The house had boarded-up and broken windows and holes punched into the walls.  The floor was littered with empty alcohol bottles and push pins.  The backyard was littered with cigarette butts, empty alcohol bottles, rusted nails and exposed electrical wires.  The mother acknowledged the home was unsafe for the child.

### B.  Status Review Reports

The October 29, 2012 six-month review report stated the child was bonding with his foster parents, F.L. and J.R.  They were very attentive to the child's needs.  The child received early intervention services for eight hours per month and speech therapy one hour per week.  The mother visited the child on a weekly basis.

On April 18, 2012, the mother enrolled in an in-patient drug program at Victory Outreach Rehabilitation.  But she left the Victory Outreach facility that same week.  On May 17, 2012, the mother enrolled at the IMPACT drug and alcohol treatment center.  However, she was terminated from the program on July 23, 2012, because of her

4

inappropriate interactions with other residents. On August 7, 2012, the mother enrolled in the Via Avanta residential treatment center. The mother failed to appear for drug testing twice in August 2012. She tested negative for drugs in September and October 2012.

The October 29, 2012 last minute information for the court document reported the mother was discharged from the Via Avanta residential program on October 18, 2012. The mother was terminated from the program because of her negative attitude and failure to follow the program guidelines and rules. The mother's drug test results were negative during her stay at the Via Avanta residential program.

The 12-month status review report, dated April 25, 2013, indicated the mother enrolled in a drug treatment program through the Los Angeles Restoration Church on December 3, 2012. The program supervisor reported the mother was participating in: drug and alcohol counseling; anger management and domestic violence classes; and individual and group counseling. In addition, the mother was attending one-hour parenting classes on a weekly basis. The mother missed drug tests on November 20 and December 4, 2012. Her next six drug tests from mid-December to March 2013 were negative.

The mother visited the child 10 times over the 6-month period. The child was initially reluctant to go to the mother during the first visit but now he went freely to her and even asked for a kiss at the end of the visit. But one of the foster parents, R. L., discussed a conversation involving the mother. According to Juliet Sadarian, a department social worker, the mother made the following statement to an unidentified counselor, "'[S]he was going to give the child away to a friend of hers because she owes him a lot, since he helped her out whenever she needed money during the time that she was in trouble.'" While the quality of the visits had improved, the mother appeared disconnected with the child during the two-hour visits.

The 18-month status review report, dated September 23, 2013, indicated the mother continued to participate in her residential drug treatment program. The mother was doing well in the program and provided negative drug test results. In addition, she

was taking parenting classes twice a week and would complete the 52-week parenting program on October 15, 2013.

The mother had monitored visits with the child twice a week. On September 3, 2013, the mother was granted two hours of unmonitored visits out of her six-hour extended visits. The child recognized the mother and called her "mom."

The child was in daycare five days a week. He was receiving regional center services for four hours per month and speech therapy one hour per week. The department recommended termination of reunification services because the child was young and the mother had exceeded the time limit to complete her court ordered programs.

The February 25, 2014 status review report stated the mother continued to reside at her residential treatment program. The mother was doing well, but still under a counselor's supervision. She was not permitted to leave the premises independently.

As of December 2013, the mother was visiting on the weekends but not on weekdays because of transportation issues. Her last three visits were cut short. The foster parents wanted to make up the remaining hours during the weekdays. But the mother and her counselor stated they wanted to continue with the weekend visitation schedule. The mother's counselor was Teresa Gutierrez. Ms. Gutierrez agreed with the foster parents that six-hour visits on Saturdays were best for the mother and child.

The foster care agency's December 2013 report stated the mother continued to struggle with her parenting skills. The mother showed no interest in learning about the self-soothing methods that the child was working on with his foster parents and therapists. When the child was first placed with his foster parents, he had night terrors and attachment issues. He no longer had these issues. The child had developed an age-appropriate attachment to his foster family and other children in his daycare. The report also stated the child's speech had improved with the assistance of his foster family and therapy.

The foster care agency report stated the child's separation anxiety increased when he spent time with the mother. The report stated: "Foster parents have been working with [the child] to help him understand he has to meet with [the mother]. The foster dads

stay with him and birth mom until [the child] seems to be calm. As the visits now involve Penny Lane Centers on a weekday and a park on Saturdays, [the child] becomes agitated as he sees the park and says 'no Daddy, no go, me no go[.]' [The child's] separation anxiety was in full bloom, but foster parents continue working towards [the department] orders and to help [the child] sooth himself for those visits. Both foster parents have expressed to [the] birth mom that they are available if she has any questions as to how to help him self-soothe or his interests and good distractions, but as of yet, she says she does not need their assistance or information."

The February 21, 2014 last minute information for the court document stated there was a very high likelihood that the child would be adopted by his foster parents. The child had been placed with his foster parents since May 4, 2012. The foster parents wanted to adopt the child and took excellent care of him. They met all of the child's medical, emotional and developmental needs. Their adoption home study was approved on March 6, 2012, and the child specific update was approved on April 10, 2013.

C. Mother's Section 388 Petition

The mother's April 23, 2014 section 388 petition sought placement of the child with her at her residential home. In the alternative, she requested six additional months of reunification services with liberalized visits. The mother argued she went over and beyond her case plan by enrolling in an intensive all-inclusive live-in treatment program and completing all of its requirements. She submitted certificates of completion for drug and alcohol counseling and anger management, domestic violence and parenting classes. The mother stated she consistently returned negative drug tests and remained sober. In addition, she had unmonitored visits with the child beginning in August 2013. The mother argued it was in the child's best interest to grant her request because he called her mom and deserved a chance to be reunified with her.

The department filed a May 23, 2014 interim review report in response to the mother section's 388 petition. The department recommended the child remain in his

7

current placement. The child was very attached to his foster parents and was thriving in their home. Although the mother had completed her current residential program, she had been discharged from two prior drug rehabilitation programs. The mother did not complete her drug program in a timely manner and exceeded the time limit to complete her court-ordered case plan. The mother had visited consistently since January or February 2013. But she did not attend the child's recent birthday party even though she was invited by the foster parents. The mother did not even call to wish the child a happy birthday that day but called several days afterwards.

## D. Section 366.26 Report

The May 27, 2014 section 366.26 report stated the child was now three years old. He attended an Early Start preschool twice a week where he received speech and occupational therapy. The child also attended a regular preschool three times a week. The foster parents expressed devotion, commitment and love towards the child. They wanted to provide the child with permanency through adoption.

According to one of the child's foster parents, J.R., the mother was mostly absent from the child's life during the first year of placement with the foster family. Beginning in January or February 2013, the mother visited more consistently. The mother visited twice a week; Saturdays at the park for five hours and two to three hours mid-week. But in January 2014, the mother's visits changed to once a week for seven hours because she found it difficult to get to the visitation site. However, the seven hour visits were too long for the child so the foster parents and mother agreed to six-hour visits. In May 2014, the mother returned to six-hour Saturday visits in a park and three-hour visits mid-week.

The child recognized the mother and went easily to her when she engaged him in play. But on some occasions, the child became agitated and told his foster parents, "'You stay, you stay. We're going to the park, don't go.'" However, once the child saw the

8

playground he would go play with the mother. The child called the mother "'mom'" but he also called his daycare provider "'mom.'"

The mother submitted two letters from the home supervisors of the Los Angeles Restoration Church residential program. A July 2, 2014 letter from Betty Escheverria stated the mother had completed the program in 2013. But the mother decided to stay to help other women in the residential program. According to Ms. Escheverria: "[The mother] is very attentive with her son . . . during their time together and at no time does she neglect her duties of a mother. [The child and mother] are bonding greatly and express their love to each other constantly. [The mother] does not attend[] any of [the child's] special events because she is not invited." Ms. Escheverria stated the mother and child were more than welcome to stay at the residential home where there was ample room for them.

An August 25, 2014 letter from Ms. Gutierrez stated the mother and child were bonding greatly. The child called the mother "'mommy'" and enjoyed playing with her. The child went to the mother without crying and was quick to give her kisses and hugs before hurrying to the playground. The mother made him meals during their visits. During the six-hour visits, the mother was able to cook, bathe and get the child to take a nap. Ms. Gutierrez noted the residential program did not allow any resident, including the mother, to go outside the home without supervision.

The mother also submitted a letter to the juvenile court regarding visitation. She wrote when the child started school on August 11, 2014, the foster parents changed the visits to three-hour visits on Tuesday, Wednesday and Thursday. Sometimes the mother received only six hours instead of nine hours of visitation because the child was tired from school. During visits, the child would give the mother hugs and want to play with her right away. The mother and child interacted well, playing with cars and dinosaurs. She also went over the alphabet and counted numbers with the child. The mother fed the child food that she prepared for him whenever he wanted to eat. On several occasions the child had toilet accidents. The mother would remind the child to use the restroom but he was so excited to play he told her he did not have to go. The mother said the child has

9

told her, "I love you." The mother wrote, "I know my son loves me as I love him, but our relationship can flourish more if we have more time together."

The foster parents, F.L. and J.R., submitted declarations on August 25, 2014 describing their relationship with the child. The foster parents stated the child was placed with them when he was 14 months old. When the child came into the foster parents' care, he could not walk, was non-verbal and had behavioral and developmental issues. They were granted educational rights for the child in 2012 and obtained regional center services for him. The foster parents worked with the child daily to improve his verbal skills because his speech was severely delayed. As part of the regional center services, J.R. and the child participated in parent-child interactive therapy for over a year to address the youngster's behavioral issues. The foster parents have taken the child on numerous vacations. In addition, the child has been part of many family events and enjoyed major holidays with the foster parents' extended family. The foster parents stated the child has bonded with them and consider them as his parents. Likewise, they considered the child to be a family member.

The August 26, 2014 status review report stated the child continued to thrive in his foster home. He was attached to the foster parents and their extended family and enjoyed celebrating cultural traditions and holidays with them. The child was attending preschool and enjoyed being at school with his friends. The child's behavior had improved tremendously and he was patient and polite towards his foster parents.

The mother continued to reside at the Los Angeles Restoration Church rehabilitation center. Ms. Gutierrez reported the mother was doing well in the program. But the mother was still under a counselor's supervision and did not leave the premises independently. The mother attended the visits with people from her program. The mother admitted she did not have any telephone contact with the child.

In early August 2014, the foster parents discussed having the visits occur three times a week during weekdays with the mother's counselor. This would happen for two weeks so the child could adjust to his new school schedule. The mother indicated she could not visit three times a week because she attended anger management and individual

10

counseling during the day.  The mother preferred having nine-hour visits on the weekends.  One of the foster parents, F.L., told the mother extended visits did not benefit the child.  During the extended visits with the mother, the child refused to nap and eat.  Until July 2014 the child had toileting accidents that occurred only during visits with the mother.  After the visits, the child would ask his foster parents to stop and get him something to eat on the way home.

The mother said the child had fun with her during the visits.  But the child would not engage with the mother once he saw his foster parents.  At the start of a three-hour visit on May 15, 2014, the child was in J.R.'s arms and only went to the mother after some prompting.  At pick up, the child yelled "'[D]addy!'" and said, "'[O]k, we go now, we go home.'"  The mother asked for a kiss but the child ignored her.  She kissed the child but he did not reciprocate.  During the July 1, 2014 visit, F.L. had to repeatedly engage the mother in play so the child would play with her.  When the child fell and hurt himself, the youngster ran from the mother and went to F.L.  At the end of the visit, the child did not want to kiss the mother goodbye.  At the August 14, 2014 visit, the child was asleep at the start of the visit.  The child had cried himself to sleep because he did not want to come to the visit.  Later, the child did not want to come to the mother and kept returning to the toys and F.L.  During the visit, the child insisted on being taken to the bathroom by F.L.  The child refused the mother's attempt to take him to the restroom.  F.L. took the child to the bathroom.  The child then said he did not have to use it but wanted to go home.  The child then attempted to lead F.L. out of the building.

The mother never had an unmonitored visit with the child.  The mother was always accompanied by a monitor from the Los Angeles Restoration Church rehabilitation program.  The report prepared by Penny Lane Foster Care and Adoption Services describes an incident during one visit as follows:  "At the end of the meeting and before [the child] left for an offsite visit with [the mother], [the child ] made [F.L., one of the foster parents], in front of everyone, promise that he would remain right there -- pointing to a chair --[]until he got back."  At the end of the visit, the child ran up to F.L. and yelled, "'You waited for me!'"

11

## E. The Mother's Testimony

The mother testified at the August 26, 2014 hearing on her section 388 petition. She stated at the August 20, 2014 visit, she napped with the child for one and one half hours. The child woke up and asked for the restroom so she took him. Afterwards, they played with cars for half an hour. The child gave the mother a kiss and hug at the end of the visit. The mother provided the child food during visits and knew a few of his favorite foods. During a seven-hour visit, the mother took the child shopping, to the park and out to eat. On the way back, he fell asleep in the car. Because it was late, she called the foster parents to end the visit one-half hour early.

## IV. DISCUSSION

### A. Substantial Evidence Supports Termination of Reunification Services

The mother challenges the order terminating her reunification services and setting the section 366.26 hearing at the 18-month review hearing. The setting order is not appealable and can only be reviewed by an extraordinary writ petition. (§ 366.26, subd. (l)(1)(A); *Jennifer T. v. Superior Court* (2007) 159 Cal.App.4th 254, 259; *In re Merrick V.* (2004) 122 Cal.App.4th 235, 247; *In re Cathina W.* (1998) 68 Cal.App.4th 716, 719.) But on appeal from an order terminating parental rights, the setting order may be reviewed where the juvenile court does not orally advise parties of their petition responsibilities. (*Jennifer T., supra,* 159 Cal.App.4th at pp. 259-260; *In re Merrick V., supra,* 122 Cal.App.4th at pp. 248-249; *In re Cathina W., supra,* 68 Cal.App.4th at p. 722.)

Section 366.26, subdivision (l)(3)(A) provides: "A trial court, after issuance of an order directing a hearing pursuant to this section be held, shall advise all parties of the requirement of filing a petition for extraordinary writ review as set forth in this subdivision in order to preserve any right to appeal in these issues. This notice shall be

made orally to a party if the party is present at the time of the making of the order or by first-class mail by the clerk of the court to the last known address of a party not present at the time of the making of the order." (See Cal. Rules of Court, rule 5.590(b).) The mother was present in court when the juvenile court set the section 366.26 hearing. The mother was served with writ documents but was not orally advised by the juvenile court of her writ rights. Because the juvenile court failed to orally advise the mother of the writ requirements, she may challenge the order terminating reunification services and setting the section 366.26 hearing in this appeal. (*Jennifer T., supra,* 159 Cal.App.4th at pp. 259-260; *In re Merrick V., supra,* 122 Cal.App.4th at pp. 248-249; *In re Cathina W., supra,* 68 Cal.App.4th at p. 722.)

The mother contends the juvenile court erred by not returning the child to her or granting her additional reunification services at the 18-month review hearing. Section 366.22, subdivision (a) requires the juvenile court to hold a hearing within 18 months after a child is removed from the custody of a parent or legal guardian. Section 366.22, subdivision (a) states in part: "After considering the admissible and relevant evidence, the court shall order the return of the child to the physical custody of his or her parent or legal guardian unless the court finds, by a preponderance of the evidence, that the return of the child to his or her parent or legal guardian would create a substantial risk of detriment to the safety, protection, or physical or emotional well-being of the child. The social worker shall have the burden of establishing that detriment." (See *In re Marilyn H.* (1993) 5 Cal.4th 295, 308; *David B. v. Superior Court* (2004) 123 Cal.App.4th 768, 789.) The juvenile court considers the extent to which the parent participated in reunification services and the parent's efforts in eliminating the conditions that led to the child's out-of-home placement. (*In re E.D.* (2013) 217 Cal.App.4th 960, 966; *In re Yvonne W.* (2008) 165 Cal.App.4th 1394, 1400.) We review the juvenile court's finding of substantial risk of detriment for substantial evidence. (*In re E.D., supra,* 217 Cal.App.4th at p. 966; *In re Yvonne W., supra,* 165 Cal.App.4th at pp. 1400-1401.)

There is substantial evidence to find the child's return to the mother's custody would create a sufficient risk of detriment to his physical and emotional well-being. The

child was removed from the mother because she was using marijuana and methamphetamine and had done so for six years. The mother did not fully comply with her case plan during the reunification period. The mother enrolled and left three drug rehabilitation programs. On April 18, 2012, the mother enrolled in the Victory Outreach rehabilitation program but left the facility soon thereafter. On May 17, 2012, the mother enrolled at the IMPACT drug and alcohol treatment center but she was dismissed from the program on July 23, 2012. She was discharged from the program because of her inappropriate interaction with other residents. On August 7, 2012, the mother enrolled in the Via Avanta residential treatment center but she was dismissed on October 18, 2012. The mother was discharged from the program because of her negative attitude and failure to follow the program guidelines and rules. She was not in another program until December 3, 2012, when she enrolled in her fourth substance abuse program at Los Angeles Restoration Church. Also, the mother missed drug tests twice in August and once in November and December 2012. At the time of the 18-month hearing on October 29, 2013, the mother had been in the one-year Los Angeles Restoration Church program for 10 months. But she had exceeded the time limit to complete her court ordered programs.

In addition, the child was then two years old and needed intensive early intervention services. In July 2012, the juvenile court limited the mother's educational rights in favor of the foster parents so the child could receive services. In addition, the mother only visited the child 10 times from December 2012 through April 2013. Although the mother was granted two hours of unmonitored visits on September 3, 2013, there is evidence she did not spend any time alone with the child. Her residential program did not permit her to be unsupervised or to leave the premises independently. There was substantial risk that the child would suffer neglect if he were returned to the mother's custody, given his special needs.

The mother also argues she should have received an additional six months of reunification services. Under section 361.5, subdivision (a)(4), the juvenile court may extend reunification services up to 24 months. This may occur if it is in the child's best

interest and there is a substantial probability the youngster will be returned to the parent's custody within the extended time period. Further, section 366.22, subdivision (b) provides in part: "If the child is not returned to a parent or legal guardian at the permanency review hearing and the court determines by clear and convincing evidence that the best interests of the child would be met by the provision of additional reunification services to a parent or legal guardian who is making significant and consistent progress in a court-ordered residential substance abuse treatment program . . . the court may continue the case for up to six months for a subsequent permanency review hearing, provided that the hearing shall occur within 24 months of the date the child was originally taken from the physical custody of his or her parent or legal guardian. The court shall continue the case only if it finds that there is a substantial probability that the child will be returned to the physical custody of his or her parent or legal guardian and safely maintained in the home within the extended period of time or that reasonable services have not been provided to the parent or legal guardian. For the purposes of this section, in order to find a substantial probability that the child will be returned to the physical custody of his or her parent or legal guardian and safely maintained in the home within the extended period of time, the court shall be required to find all of the following: (1) That the parent or legal guardian has consistently and regularly contacted and visited with the child. (2) That the parent or legal guardian has made significant and consistent progress in the prior 18 months in resolving problems that led to the child's removal from the home. (3) The parent or legal guardian has demonstrated the capacity and ability both to complete the objectives of his or her substance abuse treatment plan as evidenced by reports from a substance abuse provider as applicable . . . and to provide for the child's safety, protection, physical and emotional well-being, and special needs."

The juvenile court did not err in declining to extend the mother's reunification period past 18 months. The mother fails to establish continued reunification services would be in the child's best interest. The mother did not consistently and regularly contact the child during the reunification period. She did not have any phone contact with the child. In addition, the mother did not visit the child for the first month after his

15

detention. The mother was mostly absent from the minor's life during the first year he was placed with the foster family. From December 2012 through April 2013, the mother only visited the child a total of 10 times. Also, the mother did not make significant and consistent progress during the 18 months of reunification services. She left three substance abuse treatment facilities before making progress with the fourth rehabilitation program. Furthermore, the mother fails to show she could provide for the child's special needs. Her educational rights were limited in favor of the foster parents, who ensured the child received early intervention services to address his developmental delays. Substantial evidence supports the juvenile court's denial of further reunification services to the mother.

B. Denial of the Mother's Section 388 Petition Was Not Abuse of Discretion

Section 388, subdivision (a)(1) states in part, "Any parent or other person having an interest in a child who is a dependent child of the juvenile court . . . may, upon grounds of change of circumstance or new evidence, petition the court in the same action . . . for a hearing to change, modify, or set aside any order of court previously made or to terminate the jurisdiction of the court." A party requesting modification under section 388 has the burden of proving by a preponderance of the evidence that the child's welfare requires such change. (Cal. Rules of Court, rule 5.570(h)(1)(C); *In re A.A.* (2012) 203 Cal.App.4th 597, 612; *In re B.D.* (2008) 159 Cal.App.4th 1218, 1228.) The moving party must show changed, not changing, circumstances. (*In re Mickel O.* (2011) 197 Cal.App.4th 586, 615; *In re Casey D.* (1999) 70 Cal.App.4th 38, 47.) In addition, new evidence or change in circumstances must be of such significant nature that it requires modification of the challenged order. (*In re A.A., supra,* 203 Cal.App.4th at p. 612; *In re Mickel O., supra*, 197 Cal.App.4th at p. 615.) We review an order denying a section 388 petition for an abuse of discretion. (*In re Jasmon O.* (1994) 8 Cal.4th 398, 415-416; *In re Stephanie M.* (1994) 7 Cal.4th 295, 318.)

16

The juvenile court did not abuse its discretion in denying the mother's section 388 petition. The mother requested the child be placed with her at her residential program or six months of reunification services with liberalized visits. The child was detained because the mother had a six-year history of marijuana and methamphetamine use and neglected him. The mother enrolled but failed to complete three different substance abuse treatment programs. The mother completed the fourth drug rehabilitation program she attended but there is no evidence she could function outside of that program. The mother continues to reside at the drug treatment facility and is not permitted to leave the residence without someone accompanying her at all times. Although the mother was allowed two hours of unmonitored visits per week, there is no evidence she spent time alone with the child. The mother was under a counselor's supervision. All visitation arrangements with the foster parents were made through the mother's counselor. The foster parents reported they communicated exclusively with the mother's counselor regarding the visitation schedule. The mother did not have her own residence and was unemployed. The foster care agency social worker offered to enroll the mother in a program which could address more important issues. The program could assist the mother to obtain an apartment and a part-time job while she attended school. But the mother was uninterested and declined the offer. The mother failed to prove changed circumstances warranting modification of the order terminating her reunification services or placement of the child with her at her residential program.

C. The Beneficial Parent-Child Relationship Exception Is Inapplicable

The mother does not dispute the child is adoptable. However, she contends the juvenile court erred by failing to apply the beneficial parent-child relationship exception pursuant to section 366.26, subdivisions (c)(1)(B)(i). The mother argues she visited the child consistently and shared a significant bond with him.

At a section 366.26 hearing, the juvenile court selects and implements a permanent plan for the dependent child. (*In re Celine R.* (2003) 31 Cal.4th 45, 52-53; *In re Marilyn*

17

*H.* (1993) 5 Cal.4th 295, 304.) Our Supreme Court has summarized the juvenile court's options at the section 366.26 hearing: "In order of preference the choices are: (1) terminate parental rights and order that the child be placed for adoption (the choice the court made here); (2) identify adoption as the permanent placement goal and require efforts to locate an appropriate adoptive family; (3) appoint a legal guardian; or (4) order long-term foster care. (§ 366.26, subd. (b).) Whenever the court finds 'that it is likely the child will be adopted, the court shall terminate parental rights and order the child placed for adoption.' (§ 366.26, subd. (c)(1).)" (*In re Celine R.*, *supra*, 31 Cal.4th at p. 53; see *In re Hector A.* (2005) 125 Cal.App.4th 783, 790-791.)

One exception to adoption preference is the parent-child relationship exception. This exception is set forth in Section 366.26, subdivision (c)(1)(B)(i) which states in part: "[T]he court shall terminate parental rights unless either of the following applies: [¶] . . . [¶] (B) The court finds a compelling reason for determining that termination would be detrimental to the child due to one or more of the following circumstances: [¶] (i) The parents have maintained regular visitation and contact with the child and the child would benefit from continuing the relationship." (See *In re G.B.* (2014) 227 Cal.App.4th 1147, 1165; *In re K.P.*, supra, 203 Cal.App.4th at p. 621.) Our Fourth Appellate District colleagues have held: "[W]e interpret the 'benefit from continuing the [parent/child] relationship' exception to mean the relationship promotes the well-being of the child to such a degree as to outweigh the well-being the child would gain in a permanent home with new, adoptive parents. In other words, the court balances the strength and quality of the natural parent/child relationship in a tenuous placement against the security and the sense of belonging a new family would confer. If severing the natural parent/child relationship would deprive the child of a substantial, positive emotional attachment such that the child would be greatly harmed, the preference for adoption is overcome and the natural parent's rights are not terminated." (*In re Autumn H.* (1994) 27 Cal.App.4th 567, 575; see *In re K.P.* (2012) 203 Cal.App.4th 614, 621 [same].) To make this determination, the juvenile court considers: the child's age; the portion of the child's life spent in the parent's custody; the positive or negative effect of interaction between the

18

parent and child; and the child's particular needs. (*In re G.B., supra*, 227 Cal.App.4th at p. 1166; *In re Autumn H., supra*, 27 Cal.App.4th at p. 576.)

The mother has the burden of proving her relationship with the child would outweigh the well-being the child would gain in a permanent home with an adoptive parent. (*In re G.B., supra,* 227 Cal.App.4th at p. 1165; *In re K.P., supra*, 203 Cal.App.4th at p. 621.) Evidence of frequent and loving contact is not enough to establish a beneficial parental relationship. (*In re Marcelo B.* (2012) 209 Cal.App.4th 635, 643; *In re Bailey J.* (2010) 189 Cal.App.4th 1308, 1315-1316.) The mother also must show she occupies a parental role in the child's life. (*In re G.B., supra*, 227 Cal.App.4th at p. 1165; *In re K.P., supra*, 203 Cal.App.4th at p. 621.)

Appellate courts have adopted differing standards of review for the parental relationship exception determination. Most courts review for substantial evidence. (*In re G.B., supra*, 227 Cal.App.4th at p. 1165; *In re K.P., supra*, 203 Cal.App.4th at p. 621; *In re Autumn H., supra*, 27 Cal.App.4th at p. 576.) One court has applied an abuse of discretion standard of review. (*In re Jasmine D.* (2000) 78 Cal.App.4th 1339, 1351; see *In re K.P., supra*, 203 Cal.App.4th at p. 621.) More recently, two courts have adopted both the substantial evidence and abuse of discretion standards of review. (*In re K.P., supra*, 203 Cal.App.4th at pp. 621-622; *In re Bailey J., supra*, 189 Cal.App.4th at pp. 1314-1315.) In evaluating the juvenile court's determination as to the existence of a beneficial parental relationship, these two courts review for substantial evidence. (*In re K.P., supra*, 203 Cal.App.4th at p. 622*; In re Bailey J., supra*, 189 Cal.App.4th at p. 1314.) But whether termination of the parental relationship would be detrimental to the child as weighed against the benefits of adoption is reviewed for abuse of discretion. (*In re K.P., supra*, 203 Cal.App.4th at p. 622*; In re Bailey J., supra*, 189 Cal.App.4th at p. 1315.) No error occurred under any of these standards of review.

The child was removed from the mother's custody when he was 13 months old. The mother used marijuana and methamphetamine while caring for him. The mother resided with the child in an abandoned home that she admitted was unsafe for him. The mother was mostly absent from the child's life during the first year he was placed with

19

the foster family. Beginning in January or February 2013, the mother became more consistent with her visitation. The mother visited twice a week. This was Saturdays at the park for five hours and two to three hours mid-week. But in January 2014, the mother visited once weekly for seven hours. This was because she found it difficult to get to the visits. However, the seven-hour visits were too long for the child so the foster parents and mother agreed to six-hour visits. In May 2014, the mother returned to six-hour Saturday visits in the park and three-hours of mid-week visitation. The mother made regular visits but had no phone contact with the child. There is evidence the mother was always accompanied by a counselor during the visits.

When the child came into the foster parents' care, he could not walk, was non-verbal and had behavioral and developmental issues. In addition, the child had night terrors and attachment issues. The foster parents helped him overcome these issues. They were granted educational rights for the child in July 2012 and obtained regional center services for him. The foster parents worked with the child daily to improve his verbal skills because his speech was severely delayed. One of the foster parents, F.L. and the child participated in parent-child interactive therapy for over a year to address the youngster's behavioral issues. The child was very attached to his foster parents and their extended family. The foster parents took the child on numerous vacations. In addition, the child participated in many family events and enjoyed major holidays with the foster parents' extended family.

Although the child enjoyed playing with the mother during the visits, he did not engage with her once he saw his foster parents. The foster care agency social worker reported the child's separation anxiety increased when the youngster spent time with the mother. The child was toilet-trained in March 2014 but had toileting accidents during visits with the mother until July 2014. He had toileting accidents only during visits with the mother. The child called the mother "mom" but he also called his daycare provider "mom." At the start of a three-hour visit on May 15, 2014, the child was in his foster father's arms and only went to the mother after some prompting. At pick up, the child yelled "'[D]addy!'" and said, "'[O]k we go now, we go home.'" The mother asked for a

20

kiss but the child ignored her. During a July 1, 2014 visit, F.L. had to repeatedly engage the mother in play. This was done so the child would play with her. When the child fell and hurt himself, he ran from the mother and instead the child went to F.L. At the end of the visit, the child did not want to kiss the mother goodbye. At the August 14, 2014 visit, the child cried himself to sleep. This was because he did not want to visit the mother. Later, he did not want to come to the mother and kept returning to the toys and F.L. During the visit, the child attempted to lead F.L. out of the building. This was because the child wanted to go home rather than be with the mother. The foregoing evidence supports the juvenile court's beneficial parental relationship rulings.

Judge Alan Goodman is the assigned pro tempore justice for this case. He is unavailable to sign the opinion as of the filing date of the opinion. But he has indicated he will sign the opinion upon his return to the court.

-

## V.  DISPOSITION

The findings and orders under review are affirmed.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS


TURNER, P. J.


I concur:


MOSK, J.